## ATTACHMENT A

### Introduction

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I have been a Special Agent with the FBI since March 2004. I have worked public corruption for my entire career, with the exception of approximately three years in the legal unit of the Boston Office. I have attended several trainings related to public corruption offenses since joining the bureau.

2. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3. I submit this affidavit for the limited purpose of establishing probable cause to support a criminal complaint charging DAREN DEJONG with Theft from an Agency Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(A).

4. The facts in this affidavit come from my personal involvement in this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including from the Massachusetts State Police ("MSP") and the U.S. Department of Transportation ("USDOT"). This affidavit does not contain every fact learned during the investigation in this case, but only the information needed to support issuing the complaint. In addition, when I rely on statements made by others, such statements are set forth in sum and substance and in part unless otherwise indicated.

**Background**

**Troop E**

5. Troop E was an operational division of the MSP, the state-wide law enforcement agency for the Commonwealth of Massachusetts. Among other duties, Troop E was primarily responsible for enforcing criminal law and traffic regulations on Interstate-90, the Massachusetts Turnpike ("I-90"), which spans the Massachusetts/New York border to the Boston Harbor. Troop E headquarters was located in South Boston, and additional Troopers within Troop E were stationed at four barracks located in Weston, Charlton, Westfield, and near the Boston Tunnels.

**The AIRE Overtime Program & the X-Team Overtime Program**

6. In addition to salary for a regular 8-hour work shift, Troopers within Troop E were also able to earn hourly overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments. Beginning by at least January 2015, Troop E Troopers could earn overtime pay by signing up for and working selective enforcement initiatives, including (a) the "AIRE" (Accident and Injury Reduction Effort) program; and (b) the "X-Team" initiative.

7. The objectives of the AIRE program and the X-Team initiative were to (a) reduce accidents, crashes, and injuries on I-90 through an enhanced presence of MSP Troopers patrolling I-90 and targeting vehicles traveling at excessive speeds; and (b) reduce aggressive driving behaviors.

8. All AIRE shifts were 4-hours long and organized by letter according to a specific shift: A-AIRE from 7:30 a.m. to 11:30 a.m.; B-AIRE from 11:00 a.m. to 3:00 p.m.; C-AIRE from 3:30 p.m. to 7:30 p.m.; and D-AIRE from 7:00 p.m. to 11:00 p.m.

9. All X-Team shifts were 8-hours long and coincided with existing MSP work shifts, *i.e.*, 7:00 a.m. to 3:30 p.m. (day); 3:00 p.m. to 11:30 p.m. (evening); and 11:00 p.m. to 7:30 a.m. (night).

10. To earn AIRE and X-Team overtime pay, Troopers were required to work the duration of the 4-hour AIRE shift and/or 8-hour X-Team shift, as applicable, and conduct traffic enforcement on I-90 by issuing summonses, citations, and warnings during the shift. In the event that inclement weather rendered Turnpike traffic stops unsafe during an AIRE or X-Team shift, Troopers were to contact the Troop E desk officer in order to be re-deployed to another sector, if necessary.

11. As part of the AIRE and X-Team shift duties, Troopers were required to truthfully and accurately report, among other things, the date and time of the shift worked, the sector of deployment, and the traffic citations issued during the AIRE and/or X-Team shift.

**Overtime MSP Citation Records and Reporting Duties**

12. As part of their AIRE and X-Team overtime performance and duties, Troopers regularly issued Massachusetts Uniform Citations ("citations") during the respective AIRE or X-Team overtime shift. In issuing a citation, Troopers were required to complete the appropriate sections of the traffic citation (including the identity of the motorist and vehicle, as well as the date, time, and place of the traffic violation) accurately.

13. AIRE and X-Team overtime rules required Troopers to forward the citation to the appropriate court or station of jurisdiction, submit a copy of the citation to the MSP designated court officer (who thereafter forwarded citations with civil infractions to the Massachusetts Registry of Motor Vehicles, "RMV"), submit a copy to MSP for its internal

records, and enter the citation data into an MSP payroll processing database known as "Paystation."

**Driver History/ License Checks/ Registry Records**

14. Troopers have computer devices located within their cruisers that allow Troopers to access relevant records, such as Massachusetts driving records, records of vehicle registration and ownership, Massachusetts criminal records, and even out of state license plates, driver histories, and criminal records.

15. That system, abbreviated "CJIS," maintains a record of every inquiry made which includes, among other things, identification information of the Trooper making the query, the information that was queried, the time and date of the query, and information that was returned in response to the query, such as the name of an individual motorist.

16. At the end of each X-Team shift, Troopers were required to check driver histories through CJIS to ascertain prior motor vehicle violations for those vehicles stopped during the shift. Troopers were not required to conduct CJIS checks during AIRE shifts, however, records showed that many Troopers did conduct CJIS checks on motorists who were issued citations during the AIRE shift.

**The MSP Maintained and Stored Radio Transmission Data for Troopers**

17. Whenever a Trooper keyed his or her MSP cruiser's ignition, the MSP cruiser radio would automatically turn on and send a signal to a central MSP receiver. Whenever the cruiser's ignition was off, the MSP cruiser radio would likewise send a signal showing that that cruiser's radio was off. These radio transmission records recorded the date and time of each on/off transaction for each individual MSP cruiser radio, as well as which radio tower the signal was transmitted from.

18. Because the radios connect through a series of towers throughout the state, the radio data also provided general location information, *e.g.*, placing an MSP cruiser radio (and the cruiser to which it is assigned) within a general region inside the area covered by a particular radio tower.

19. Each Trooper maintained control of an assigned MSP cruiser on a day-to-day basis, and commuted to and from home in the MSP cruiser. As a general matter, Troopers were required to have their MSP cruiser radios on during their regular and overtime shifts, including AIRE and X-Team shifts.

20. From in or about January 2017 and continuing through March 2018, MSP conducted an internal audit of Troop E's overtime practices. As part of that audit, MSP compiled spreadsheets of the radio data for the cruisers of Troopers who were suspected of abusing the overtime system.

21. Based upon a review of these spreadsheets and other MSP records (including, but not limited to, refueling records, CJIS data requests, attendance and payroll records, and personnel files), investigators were able to observe individual Trooper radio activity/inactivity patterns, as well as radio transmission location patterns (*e.g.*, near the Trooper's home at similar times each work day). This investigative data (a) corroborated that the Trooper maintained custody and control of a certain MSP cruiser radio; and (b) determined whether the Trooper's MSP cruiser was on or off at a certain time, including the duration of such activity or inactivity.

**The MSP Received Federal Funds from the U.S. Department of Transportation**

22. The USDOT is an agency of the United States that provides hundreds of thousands of dollars in funding on a yearly basis to law enforcement authorities that enforce traffic regulations on public roadways, including the MSP.

23. For each of the calendar years 2015 and 2016, the MSP received annual benefits from the USDOT in excess of $10,000, which were funded by the USDOT pursuant to numerous federal grants.